Case number 18-1285 at Elk, State of Maryland, District of New Brunswick, Detention Agency. Good morning, Your Honor. I'm William Cassatt, and I represent Petitioner, State of Delaware. I will be addressing the out-of-state monitoring issue on behalf of the State of Delaware, as well as Petitioner interveners in this matter. Just briefly, Your Honors, my colleague, Mr. Joshua Berman, will be addressing the remaining Step 1 issues, and my colleague, Mr. Michael Sandy, will be addressing the Step 3 issues. Could you raise the microphone a little bit, or get closer to the microphone? Oh, sure, Your Honor. Is this better, Your Honor? May it please the Court. Delaware and Petitioner intervener states are asking the Court to find that Section 126 permits any state in a multi-state non-attainment area to file a Section 126 petition to address the measures that are contributing to the multi-state area's non-attainment. There are three points I would like to make in support of Delaware and Petitioner intervener's position. First, we believe the plain language of Section 126 clearly authorizes any state within a multi-state area to file a Section 126 petition on behalf of the entire multi-state area. This Court in Denmark v. EPA, the cases that Delaware cites in its reply brief, this Court construed the language, any state, in the context of a request for an attainment date extension from a multi-state area. Do you need to be suing on behalf of the whole multi-state area? I thought the simplest ground you have, which to me is a pretty compelling one, which is that even if the receptor is in Pennsylvania, once you get a hit, that triggers legal consequences for Delaware, and you're Delaware, and that's all you need. That, Your Honor, I don't know that I could have summarized our argument better than you just did. That's really our argument in a nutshell, that because every state in a multi-state area is equally affected by any one non-attaining monitor, any state in a multi-state area should be able to petition based on that non-attaining monitor. I see my time is about up. Just briefly, even if the Court finds that the plain language or the statute is ambiguous, we still feel that EPA's interpretation is unreasonably narrow, because it bars states that are similarly situated in a multi-state non-attainment area from being able to avail themselves of a remedy, simply because the non-attaining monitor is not located within the petitioning state. We don't see any support for that narrow interpretation in Section 126. And then briefly, Your Honor, the last point is we feel that if EPA looked at Delaware's petition the same way as it did Maryland, it would have found that Delaware's petition satisfied Steps 1 and Step 2. EPA concluded Maryland satisfied Steps 1 and 2, because under its CASPER update, it found that Maryland would have a maintenance receptor. But that same modeling showed that the Philadelphia non-attainment area would also have a maintenance receptor. So we feel that if Maryland was applying the same standard, or I'm sorry, that if EPA was applying the same standard to both states' petitions, it should have concluded that Delaware's petitions also satisfied Steps 1 and Step 2. All right. Thank you, Mr. Kessler. Thank you, Your Honor. Mr. Burl. May it please the Court, Joshua Berman on behalf of citizen petitioners in the State of Delaware. I will address the remaining Step 1 issues. I would acknowledge that if the Court agrees with the argument from Mr. Kassab, it is not necessary to reach the issues that I'm going to be addressing here. The operative remaining question at Step 1 is whether Delaware itself has an air quality problem. On the record, it does. Does his argument actually go to the 2015 NAICS, unless you make an argument about what the appropriate analytic year is? Correct, Your Honor. This argument exclusively goes to the 2015 analytic year. The arguments that Mr. Kassab just made affect the reasonableness of the EPA's interpretation under both 2008 and 2015. So you want to address what the correct analytic year is, then? So Delaware, there's no dispute on the record here that Delaware submitted a petition pursuant to both. I'm sorry, I don't mean that. I mean whether 2023 is the correct year or not. I see. Yes, Your Honor. So as this Court most recently reaffirmed in the Wisconsin and New York decisions that came out this fall, of which there are 20 HA letters regarding, the correct analytic year has to be the year that Delaware is required to attain the NAICS no later than. Here, Delaware is designated as a marginal non-attainment area for the 2015 standard. It's undisputed on the record that its attainment date is August 2021. EPA's decision to look exclusively at air quality projections beyond that date are foreclosed by this Court's decisions in Wisconsin and New York, which say that states are required to attain by their attainment dates and good neighbor obligations must be implemented on a timeframe that permits timely attainment. More fundamentally here, EPA unlawfully fails to give effect to the present tense emits in Section 126. EPA acknowledges that emits refers to current emissions, but it insists that release is only available for future non-attainment. EPA is unable to bridge this divide. Current emissions affect current non-attainment, not air quality, in 2023, which is what EPA exclusively considered. As this Court already observed in North Carolina, Section 126 can provide release for present-day violations of air quality standards. And the Third Circuit in Gen. Rima affirmed that Section 126 is a tool for immediate action. On this record, it is undisputed that Delaware monitors persist in non-attainment of the 2015 ozone standard. Delaware therefore satisfies Step 1 for this standard. Moreover, even if the Court were to disagree about the plain language of Section 126 and some consideration of future air quality were permissible, as we just discussed, the schedule... EPA's analytic approach to Step 1 conflicts with the attainment schedules in the Act that were at issue in this Court's decision in Wisconsin and in New York. So just on the present versus future point, you don't disagree that one essential element of a Section 126 petition is a violation of the Good Neighbor Provision, right? That is correct, Your Honor. And I thought in, I think it was North Carolina, we upheld the view of the Good Neighbor Provision as future-focused. That's correct, Your Honor, but the context is quite important. In the North Carolina case, this Court was considering EPA's interpretation of the word will in Section 110A2Bi. And so it connotes both certainty and... That's right. It acknowledged there were two distinct meanings that the word connoted and said in the context of the Clean Air Interstate Rule, which was a federal implementation plan, it was not unreasonable for EPA to give it forward-looking effect. But in that context, in the planning context, it made sense for that word to have future effect. Implementation plans are, by their nature, forward-looking. They are planning documents. By contrast, in the next sentence, the North Carolina Court turned around and said, Section 126 is different. Section 126 provides relief for present-day violations of air quality standards. Again, we cannot see a way to read the word amidst, consistent with, the exclusively forward-looking nonattainment consideration that EPA has given it. No, but, I mean, there's the anti-chameleon canon, right? Once you impose a certain construction on a statute, that's what the statute means. It can't shift according to context. As the Court recognized, the context there did matter. The Court expressly recognized that Section 126 presented the context was a justification for upholding EPA's interpretation of 126 as forward-looking. But, I mean, once we've done that, that's what Section 126 means, and that's what you're stuck with here. Your Honor, even if the Court finds that, again, as the discussion I had with Chief Judge Garland, it is still relevant here that the things that EPA considered in rejecting Delaware's petition at Step 1 were exclusively beyond Delaware's attainment date. And I believe, of course, decisions in Wisconsin and New York foreclosed consideration of air quality beyond attainment dates as a basis for disclaiming the existence of an air quality problem. And also, it's clearly held that good neighbor obligations must be implemented on a timeframe that's consistent with and allows for a timely attainment of the air quality standards. I see my time is up. Thank you, Your Honors. Good morning, Your Honors, and may it please the Court. Michael Strandy, representing the State of Maryland, discussing the Step 3 issues on behalf of the petitioners in this matter. With regard to the Step 3 issues, I'd like to discuss three points. The first is that the update rules aggregate assumptions are inconsistent with the source-specific data presented in the petition before you. Two, that the update rules cap-and-trade program fails to reasonably address the emissions from the named units in consideration of how ozone attainment is measured. And three, how the EPA's denial of non-catalytic controls was inconsistent with its past statements. Can I ask you to address number four and to address that first? It may incorporate all the others, which is how do our decisions in Wisconsin and New York affect the ability of the EPA to rely on the update rule at all? Absolutely, Your Honor. The update rule, this Court's decision in Wisconsin, absolutely addressed the issue of EPA's establishment of an aggregate emissions limit for purposes of the update rule, which was a regional rule meant to address hundreds of sources across 22 different states. And this Court found in that decision that EPA's use of a three-wide average to generally approximate what optimization would be, a 0.10 pounds per million BTU emissions rate, was reasonable within the scope of that rule. But it's important to note a couple things here, Your Honor. That rule, in establishing that rule, the EPA noted that specific individual units would be able to, could have better rates than that 0.1 emissions rate, and that their use of a generally achievable rate was specifically noted, their use of a single uniform rate was only appropriate, quote-unquote, due to the partial nature of the remedy. And this Court, as Your Honors know, has said that partial remedy was inappropriate and has remanded to EPA the update rule in order to implement a complete remedy. We upheld the rule with one exception, right? And the one exception was the failure to harmonize the upwind deadlines with the, on your good neighbor with the downwind attainment deadlines, right? Well, I think you, I think this Court said the rule was reasonable but for it being a partial rule and that a complete remedy needed to be implemented by the deadline. Because of the failure to harmonize those deadlines. That's correct, Your Honor. It seems like a different problem from some of the ones at issue here. We declined to vacate the rule. The reason we gave for declining to vacate the rule was to preserve the structure and integrity of the cap and trade program. And we certainly didn't foreclose EPA from preserving that kind of program in whatever it did on remand. There are two different things here and I definitely want to try to address both of them. You're absolutely right, Your Honor. I don't think EPA's use of these generalized assumptions in establishing its partial rule, which was meant to be broad and address generally what optimization was, was intended to be overturned and it wasn't overturned. But that doesn't also mean that these particular units can't do better. And EPA's own, EPA's conceded that their step three analysis is to consider whether there are additional cost-effective emissions reductions available at these particular sites. I think this would be more akin to the way this Court and the Supreme Court have treated EPA's establishment of statewide emission budgets under the original CASPER rule and the CASPER update. In those cases, EPA put forth a general strategy for establishing emissions budgets and then allocating allowances to individual sources. This Court and the Supreme Court upheld that general structure but said there can be as-applied challenges. And this is like an as-applied challenge here, Your Honor. Remember, we're talking about a rule that was promulgated under Section 110 and whether that rule under 110, which is a statewide federal implementation plan, can satisfy a 126 petition, which is a separate independent provision under the Clean Air Act meant to address specific sources. I mean, that goes back to a question I asked your colleague, which is one essential element of a 110 finding is a 126 violation. That's correct, Your Honor. So EPA has already said here that we have a downwind nonattainment problem with regard to Maryland and that Step 2, the cap-and-trade program that they have, has not pushed the states, the upwind states that are named in the petition, below their threshold mark. And under EPA's own three-step analysis, the next step is then to determine whether there are any cost-effective emissions reductions available within the state. And this petition, based on fact-specific data about these specific sources, says there are more cost-effective emissions reductions. You may be misunderstood. I have a more fundamental administrative law question issued here, which I thought was an argument that you had made in your 28-J letter, but maybe I'm wrong about that. That is, the government's answer to your 126 petition is that you haven't shown that a major source would emit any air pollutant in violation of the Prohibition of the Good Neighbor provision because the update rule ensures that there is no violation of the Good Neighbor provision. That's their reason. We have found that the update rule does not satisfy the Good Neighbor provision, and that means that the justification they have provided under the Chenery rule no longer upholds the rule that they, the reason that they gave in rejecting the petition. Now, I'm not saying this is correct analysis, but that strikes me as your best argument in all the 200 pages of briefs that you found here. If you could focus on that, I would appreciate it. Sure, Your Honor. So we have a remand. You're absolutely right. We have a remand of a rule to provide a complete remedy. EPA has not to date told us where the proper line is to provide that complete remedy, and so it's unclear how EPA can rely upon a remanded rule as satisfying this source-specific 126 petition. I would move on to cap and trade, but I'm not sure if that answer. Well, they gave an answer in their 28-J letter, and if you could respond to that, that would be helpful. I'm struggling. All right. Well, we'll give you a chance, I guess. Are you the rebuttal speaker as well? I am. I presented the question. I'm sure that the EPA will answer it, and then you'll have a chance to rebuttal. Okay. That sounds fair, Your Honor. With regard to cap and trade, I know Judge Katz has asked a question about cap and trade, and I want to make clear that Maryland isn't and the petitioners aren't stating that a cap and trade program can't be used as satisfying a 126 petition. Of course, if EPA established a cap and trade program, which prevented the state from contributing above the threshold amount at step two, that would satisfy the 126 petition, and it's possible that EPA could craft a trading program that would limit contributions from individual sources consistent with the way ozone attainment is demonstrated, but that's not the cap and trade program we have before us today. EPA is relying on emissions from outside sources not named in the 126 petition to establish a generalized optimization rate without looking at what the proper optimization rate is for these particular sources, and then the cap and trade program would allow a state to go up to 20 percent over its statewide budget, 120 percent of its emissions can be allotted for with allowances, and EPA said so long as those main sources, even if they're emitting more, it's okay so long as sources outside of the petition scope are eliminating the same amount of emissions, and that's a fundamental question about EPA's authority under Section 126. Section 126. You're right about that. Wouldn't that eliminate any kind of cap and trade program? No. I think a cap and trade program could be crafted such that it looks at the named sources in a 126 petition and allows for balancing and movement amongst those sources. But you can't have a cap and trade between states or within a state? You absolutely could. I think the proper place for that would be at satisfaction of Step 2. You're getting below the threshold now, and so you've satisfied the first part. Just to be clear, you're saying under Step 3, you can't have a cap and trade that doesn't address the specific sources that you raise in a 126, but instead addresses all the sources in such a way as to satisfy whatever cost-effective result the agency comes up with in terms of contributes substantially to downstate emissions? I think that's right, Your Honor. Maybe if I take a step back and do some table setting here for you, and maybe I should have done that at the beginning. We're talking about an update. The update rule was promulgated under Section 110 as a federal implementation plan to resolve a state-wide failure to do an adequate fit state implementation plan. In contrast, Section 126 is an independent, Congress said, an independent mechanism to address violations of the Good Neighbor Provision from a source or group of sources. By the plain language of that section, the EPA must then make a finding based upon that petition, whether those named sources do or do not do what the petition says. And then if there is a finding, the EPA must regulate those sources. Those sources must either shut down or come into compliance with the Good Neighbor Provision, and it's unclear how EPA can rely on emissions reductions from other states or other sources in order to satisfy those specific obligations under Section 126. I don't know if that answers your question. I see I'm out of time. I'd be happy to respond to more. Thank you. Thank you. Good morning, Your Honors. May I please support? My name is Samara Spence. I'm here on behalf of EPA. With me at Council table, I have Abhi Vijayan and Stephanie Hogan from EPA's Office of General Counsel. I'll get into the Step 1 and Step 3 issues in a little bit more detail, but I'd like to start with the questions about the Wisconsin opinion and how it affects EPA's justification here. It's important to keep in mind, as I think you, Judge Katz, pointed out, the Wisconsin opinion upheld most of the update rule. That was the modeling that EPA did, the suite-wide assessments that EPA did, the cost threshold, the trading program remedies, all that was upheld. The remand in Wisconsin had to do with the fact that that rule was partial,  There were things that EPA didn't assess in the update, and those things were controls at non-power plants, non-EGUs, and things like new catalytic controls and new non-catalytic controls. So there are sources out there that haven't installed those things. What the update focused on was optimization and operation of existing catalytic controls and existing non-catalytic controls. Those are the same controls that petitioners have brought forward in this case. So when you ask Judge Garland about how does that impact EPA's conclusion as to those sources, it doesn't, because EPA's assessment of these sources in the update was complete, and it is complete now. What's not complete is the rest of it. These petitions are not about the rest of it. They're not about non-power plants. I understand that argument, and I expect the other side will— I'm expecting the other side to answer that question a little now that they understand the argument. But, again, I'm thinking about a slightly more basic level. Your argument is that Section 126 petition fails as long as it doesn't produce violations of the Good Neighbor petition, which is 110, right? That's your argument. But in Wisconsin, we held—and in order to establish that, you rely on the update rule, which determines that the upwind states will not contribute significantly to the downward states' attainment. Contributes significantly, includes cost analysis, et cetera, right? So I've got sort of the rationale here, correctly? This is one part, which is the EPA didn't stop with what was in the update. EPA supplemented that analysis in this rule. So EPA said, here's what I did in the update. Here's what I looked at. Here's the remedy I imposed. And I'm also looking at these new things. So it did not just rest a few hours in the update. Well, but all of that rested on the wrong year. I want you to assume for the moment that all of that rested on the wrong future year, okay? I appreciate you have an argument to the contrary. But for the purposes of this discussion, assume that we think, at least that I think, that 2021, not 2023, is the right year. Under those circumstances, in Wisconsin, we said, the update rule we consider in this case fails to eliminate upwind states' significant contributions to downwind pollution by the statutory deadline for downwind states to meet the next foreclosure. So if in your justification you are relying, in significant part, on a rule that we have said actually fails to satisfy the good neighbor provision, how can we uphold your judgment in this case? Your judgment is based on a rule that we've already held is insufficient. I have two responses to that, Your Honor. And part will set aside because it's a longer discussion, and that has to do with what the court actually held in Wisconsin. I think I just read to you what the court held in Wisconsin. I understand it upholds generally the idea of cap and trade, all the other things that you began with your table setting. I'm not interested in that for right now. I'm looking at the bottom line, the reason we remanded, and I read you the sentence. Yes, so that sentence is one of the many ways the court states it, and that leads to the 2021 versus 2023 discussion, which I'll get into. The other part of the answer to your question is that as to these controls, there is a deadline in the update. The trading program had a deadline of 2017, and the court pointed that out and explained the background. The reason why the court said it was not complete, where it repeatedly said, you didn't do it by any particular date, by any particular date, by any particular date, what it meant by that is that it was partial, because there is a deadline for these controls, for the remedy for these controls. That's what the update trading program is. It's a remedy for these sources. So even if that is your formulation is what the court in Wisconsin held, which I want to be clear I disagree with, but these sources have a deadline. I'm not sure how that solves the problem. That is, these sources alone do not satisfy the requirement of the good neighbor policy that the upwind states that contribute significantly to downwind attainment stop doing that, and they have to do it by a certain date. Why is it sufficient to say, well, we picked X number of sources, and they will be done by that date, unless you can show that those sources, together in a cap-and-trade program, end the problem of significant contribution to downwind states' attainment by the date that is the appropriate date? So the reason is because this is the remedy that – sorry, these are the sources that were targeted by that remedy, and this remedy is addressing those sources. Those sources are doing what Maryland is asking for. So in the Wisconsin case, it was about how the upwind states, as a whole, fulfilled their duty to eliminate, and they haven't. That's what the court held in Wisconsin. These are 126 petitions. We're looking at specific sources. The sources that we're looking at are sources that were already addressed. They're covered by the trading program. The trading program is requiring them to operate their controls, and it's working. Now, there's a technical question that Counsel for Maryland brought up, which is, well, could you get these reductions from somewhere else? Technically, yes, but EPA looked at that. On this record, what EPA found is that the sources are operating. And the reason we know that, there's a chart, I believe it's on page 74 of EPA's brief, and it shows the 2017 emission rates of these facilities. All of them but one in 2017 were emitting at rates that showed that they were operating their controls. What about the non-catalytic ones? The suggestion about non-catalytic. Right. So the non-catalytic controls, it's a slightly different statutory question. It's the question under Step 3 of EPA's analysis, which is, is it cost-effective to operate these controls? And that's what gets you to, do they significantly contribute and interfere with download maintenance, right? So in the update, EPA already looked at those controls and already said it's not cost-effective to do that. It's really expensive and it doesn't have enough downwind benefit based on our modeling, which is really complicated, to make it significant within the meaning of the good neighbor provision. EPA looked at them again here. So there's two facilities that petitioners raised with respect to non-catalytic controls. And EPA looked at those two facilities and said they're small. They're not emitting that much. And when I look at my modeling, it shows that the potential downwind improvements are pretty minimal. So we're sticking by that cost threshold that we used in the update. And there's something I want to – We still said that that rule didn't go far enough. So don't you have to – let's just talk about the remand in Wisconsin. Don't you have to reopen the question whether non-catalytic are the next most cost-effective control to achieve a greater degree of enforcement of the good neighbor provision? Not necessarily, because EPA already addressed those controls. Remember, the controls that were left on the table were – You have to do more on remand, right? Yes. You couldn't just reinstate the rule and say DC circuit, never mind. Absolutely. Now, you obviously have discretion to consider whether the something more is non-catalytic controls or non – what's the acronym – EGUs or something else. Well, what was clear in Wisconsin is EPA does have to look at whatever it needs to look at to say we've looked at everything. That's what the courts got EPA on. They didn't look at everything. EPA said they didn't look at everything. They looked at SCR. They didn't look at new SCR. They didn't look at new SNCR. And they didn't look at non-EGUs. So EPA has to go back and do that. And make comparative judgments, right? Sure. And so let's say they want to revisit – And so it may be the case that the non-catalytic are the next most efficient set of regulations. It may not. So they can revisit that conclusion. Right. I think that's what they're getting. And if they can revisit, then Chief Judge Garland is right that it's not a sufficient answer in this case for EPA to say, oh, we addressed – we resolved those issues, resolved those issues in the update rule. So it is because in the denial, EPA didn't just say the update resolved those issues. EPA took another look. In this denial. In this denial. In this denial. EPA said, okay, I already reached a cost threshold in the update. Now let's look at what new information you've given me. You've got two facilities. They're small. They're low emitters. And when I look at my modeling, there's not that much downwind air quality improvements available. So I'm making a finding under step three that it's not cost effective to operate these controls. So even if that was true, that EPA had to revisit this on remand from Wisconsin, for these non-catalytic facilities, EPA has already done that here. So it doesn't change that legal landscape. Okay. So one possible justification is we did this in the – we resolved this in the update rule. And let's assume for the sake of argument we don't think that's good enough. So you just gave me another one, which is in the denial here you made a microassessment of these two plants. I had thought that there was a third rationale, which was in the administrative record and therefore might solve the Chenery problem, which is simply that it's the petitioner's burden of proof. And regardless of what you say, they didn't satisfy that burden. Yes, Your Honor. I'm glad you bring that up because when it comes to these step three questions, there's really two key cases that really should frame how the court should look at this. One is the 1998 New York case that says the technical burden is on the petitioners. EPA doesn't have to affirmatively prove or affirmatively disprove the allegations from petitioners. They have to present data. They have to show that a finding must be made. The other case that the court should really pay attention to is Appalachian Power. Now, petitioners never really confront this case, but I really think it resolves a lot of the legal questions that petitioners have raised, which is that you can slide stack a trading program based on what we think a specific source that's already covered can do. In Appalachian Power, EPA used a regional analysis that was already on the book to make a 7426 finding, and it implemented a regional remedy to resolve the Section 7426 finding. So if EPA can use a regional remedy to resolve allegations about specific sources, then, of course, if there's already a regional remedy addressing these same sources, then it makes sense for EPA to conclude that they've satisfied their good neighbor obligations by participating in that trading program. And so I encourage the court to pay attention to that case because it's really directly on point for a lot of these issues. You can use a regional remedy to solve concerns about specific sources. That's correct. That's a general statement of law, which I'm willing to take your word is true, but that doesn't really answer the question whether EPA did that here. I mean, that just takes us back to what you said earlier, which is to the extent there were things that needed cleaning up after Wisconsin, you did that in the update, in the denial. Right. So as a matter of, I think, fair precedent, Appalachian Power says a regional remedy under Section 7426 was fine. As a matter of fact, as a matter of record fact, EPA looked at these sources. They said they're operating their controls. The goals of the trading program are being met. There were some specific allegations like, well, are they idling their controls during the ozone season? They're not, not on this record. That's not what this record shows. So EPA sort of went through those things and said, we've already addressed this. I'd like to also point out this sort of practical question, which is a little strange. Let's say you impose a source-specific limit on these sources. Well, you've still got the regional cap, so other sources then can go emit more, right? What matters for ozone is the upwind total NOx, right? This is a regional pollutant. You have upwind NOx, downwind ozone. All right, but if you're looking at the wrong analytic year, which we've held you are, then maybe your cap has to be lower. So I'd like to get into that question, if we could, Your Honor. Because I think that when you say that the court has held that EPA is looking at the wrong analytic year, this is correct. I want you to assume for purposes. I understand your argument. I don't think that will be advanced by oral argument on it. The problem I'm working with is the assumption that you're on the wrong year. Now, is your argument still the same, even if the year is not 2023? That you have to reach attainment then? That you have to solve the good neighbor problem then? So for both Step 1 and Step 3, I'm not clear on which one you're asking about. But for both, yes, what analytic year EPA is considering for future and on attainment doesn't matter on this record. And it doesn't matter under Step 1 because Delaware didn't prove any future analytic year. Delaware didn't say or prove in any way that they will have an air quality problem by 2021. It goes back to the burden of proof point. It goes back to the burden of proof point, exactly. Delaware also didn't prove, by the way, that even if you could look at these out-of-state monitors, that the multi-state area will have a downwind air quality problem at any future year. So EPA didn't have to prove any particular future year. What EPA had to do was look at the record that Delaware presented. EPA did that. And then EPA went above and beyond that step by doing its own gut check with this model that it already had on hand. So you don't have to even look at that question about what future analytic year matters. The court doesn't have to reach that. And I do want to point out, because this is important, EPA did say in the record that even if they looked at these out-of-state monitors, there's still no proof of a downwind air quality problem. Another thing I want to point out about these out-of-state monitor questions is that there's this strange thing in the record. Delaware says, well, you have to look at monitors in Pennsylvania to prove downwind air quality problems. But three of the four facilities that Delaware petitions about are in Pennsylvania. You can't have interstate transport from Pennsylvania to Pennsylvania. So they can't have it both ways. If we get to look at these out-of-state monitors in Pennsylvania, then three of their petitions go away as a matter of law immediately. Why? The interstate transport is from Pennsylvania to Delaware. If the monitors in Delaware don't even have a current non-attainment problem, Your Honor. So if what you're looking at are air quality monitors in Delaware, there's no non-attainment problem. Delaware didn't prove it. EPA's own assessment shows that it's not there. Delaware is an upwind state to Philadelphia. That's why it's included in that non-attainment area. So if what Delaware wants to do is rely on these downwind monitors in Philadelphia, you can't then say that upwind sources in Pennsylvania are contributing to non-attainment problems in Pennsylvania. That's not interstate transport. So it's just how the cards that they've built up that doesn't really add up. And so all you really have to do to answer these questions is get to the first part, which is that Delaware didn't meet their burden under Step 1. Maryland didn't meet their burden under Step 3. Can I ask you about the Step 3 burden, that is, with respect to cost? How is an individual state to be expected to make the kind of significant contribution based on the cost-effective analysis? How could an individual state, you talked about practicality. How could a state ever prove that? They'd have to look at every single possible kind of control and every single possible kind of emitter. That's the job that EPA does in order to make the determination of what the amount per ton is cost-effective. How could an individual state, asking for a greater limit on emissions when they're reaching non-attainment, ever do that? So I would be speculating about exactly what the technical analysis would have to show. But, you know, if, for example, they were to say, hey, here's some sources that haven't already been addressed, or here's a standard that hasn't already been addressed, you know, I'm going to show you the cost of controls. I think this is cost-effective based on whatever. You know, there are instances. Based on whatever, I mean. The EPA's analysis is not really a cost-benefit analysis. It's a cost-effectiveness analysis. And that requires more than just showing cost-benefit. It requires evaluation of all the possible controls and all the possible plans, not just in any one plan. No, I don't think that's necessarily true, Your Honor. I mean, in the update, EPA didn't do that. EPA looked at certain controls and assessed those controls for cost-effectiveness. I think you could, for example, look at non-EGU sources and say, you know, here's this specific set of controls, and I think that they're cost-effective. I mean, EPA. I don't think I think they're cost-effective. It's not going to persuade anybody. So there would have to be something else. So they would have to make a case, right? It would have to be a technical. That's what the 1998 New York case says. They have to make a technical case. And so what EPA looked at is the quantity of emission reductions available, what would be achieved upwind, and what would be achieved downwind. I think an important thing to keep in mind is that ozone is just an unusual pollutant, right? You have upwind NOx, a whole bunch of other stuff, this, you know, complex process that happens in between, and then eventually you get downwind ozone. Other pollutants are a little bit more straightforward, like sulfur dioxide, for example. You can sort of measure the amount of sulfur dioxide coming out of a plant and have a pretty close correlation to what the air quality is going to be. So, you know, there could be situations with SO2, and there are examples of that. We also have examples of where EPA has made 7426 findings under an ozone program. That's what was at issue in the Appalachian Power case. That was an ozone 7426 finding, and the petitioners in that case did, you know, make the case. And a lot of that used information that EPA had already generated. Do they have to identify some category of reduction technology or whatever, other than the ones you've already ordered? Even if they don't have to identify every possible one in the universe? So if I understand you correctly, it's a question of could you ever look at the same sources that EPA has for the same controls that EPA has already assessed under 7426 and make out a finding? Yeah, I mean, I'm just looking at one of your graphs, which has points for different possible technologies, and one point is optimizing the catalytic, and the next point, as you go up on pollution reduction on one axis and cost on the other, is optimizing non-catalytic, and then there are a few other points, and then who knows what other possibilities there are in the world, and it seems unrealistic to say that the burden is to identify every possible point and compare them. I think that's right. Okay, so why isn't it enough for them to say, all right, we know one point is optimizing catalytic, and we know the next point on the graph is optimizing non-catalytic, and that's the one that, now that we know the update rule didn't go far enough, I mean, here's EPA's graph, and the next most expensive option is non-catalytic, so you have to do that one, optimizing non-catalytic. It's a case they can try to make, right? It's a case that they would have to make based on data, which they did here in EPA-assessed, but I think the court has to keep in mind that whether or not a significant contribution exists is a matter of discretion to EPA. I mean, the court has said that repeatedly, and it's in Wisconsin. It says, you know, EPA still has significant latitude, for example, in finding whether it's significant. So, yes, they could come in and say, hey, you already assessed this. I've got some new information. I think you should make this finding. EPA can look at that data and say, you know what, I don't agree. Why can't they piggyback off your analysis in the update rule, which plots a bunch of points, and you draw a line between catalytic and non-catalytic, and you say we're going to go so far but no farther, and they say, all right, you know, EPA's done all the relevant work. This is the next best possibility. So that's what EPA now has to do. I mean, that's where they tried to do that. EPA looked at it and said, we disagree. And what was left on the table in Wisconsin, what EPA has to go back to do, isn't to revisit these SNCR controls. It's to look at other stuff. EPA can revisit SNCR controls, right? They have the discretion to do that, especially if there's new data that says that they should. It's not required. And here, when that was presented to EPA, EPA said, I just disagree. And that's because there may be other options on this graph somewhere in between catalytic and non-catalytic in terms of bang for the buck? That's certainly possible. And that seems to come close to saying they need to prove the negative, consider every possible technology, and negate everyone. No, Your Honor, I don't think EPA is asking them to prove the negative. I think, you know, what's clear in EPA's decision is that EPA, first of all, it was before the Wisconsin decision came out, so they didn't have the opportunity to talk about that. But I think the outcome probably would have been the same. EPA said, you're asking me to do something with controls that I've already assessed. There's a whole bunch of stuff I haven't assessed, but you're not asking me about that. You're asking me about the stuff I already addressed. I already imposed a remedy for catalytic controls, and I already said non-catalytic controls are not cost effective. I'm looking at it again. I'm looking at new data that you presented. I'm looking at new data that I have. And I think what I've done is enough. So that's really what permeates throughout EPA's denial is that they say, I've looked at this. I'm going to look again. You're not asking me about things I didn't look at. Short exception of Brunner Island, which is a record issue, didn't make the case. You introduced that by saying they didn't have Wisconsin in front of me, but they probably would have given the same answer. So this is a classic case that we require a remand for. The lawyer is saying this probably would have been the same answer. It's not good enough. I say probably because, you know, I don't know what the facts have changed since then. I know what data is in this record, and EPA can always make another finding. But what Wisconsin requires I don't think actually touches on any of the things EPA actually did here. And I want to ask, Your Honor, because I think this is important. There's a lot in this Wisconsin opinion. There are various statements of what EPA was holding. For example, it says, you know, one formulation is that upwind eliminations have to happen by the statutory deadlines by which downwind states must demonstrate attainment. Marginal areas don't have to demonstrate attainment. Marginal areas don't have control obligations. I think what Wisconsin requires was control parity. You have upwind controls installed at the same time as downwind controls, and that way you make sure that you're not over-controlling the upwind states and under-controlling the downwind states. That's what I think Wisconsin requires. But the court just didn't have the question in front of them of what do you do with marginal areas where there are no control obligations, where there is no attainment demonstration requirement. Yes, the statute says attain, but it doesn't specify steps to do that. All they have to do as a marginal state is collect data and report data. If you were to have parity between upwind and downwind states with data collection, you know, that's not the same thing as saying I'm asking upwind states to install control. Where's the word parity in Wisconsin? That's my summary of like that. That's what I thought because I didn't read that word, and I appreciate you're asking us to look really closely at it because I think you can assume that we've already done that. So the twist on this is if this is a case about parity, Wisconsin was about that rather than about the ability to satisfy the good neighbor responsibility by the date on which somebody is required to do something. And if you want to point out a particular paragraph that says that, I'd be happy to look at it. I would like to point out the paragraph where I think it really encompasses this. What it says is that page 314 of the Federal Register. It says the CASPER update rules fail to eliminate upwind state significant contributions to downwind solution by the statutory deadline for downwind states to meet the NACS or OZAs. That in turn forces downwind areas to make greater reductions than the good neighbor provision requires. This is an equity statement about parity. And there's another place that I would like to point to, Your Honors. Where's the parity part? The point is it forces downwind areas to make greater reductions. Right. So if you were to force upwind states to install controls before downwind states install controls, then you have that same problem in the other direction. Right. You have a deviation in a direction that requires upwind states to do more than their share. There's another paragraph I'd like to point to, Your Honor. This is at page 320. It says we do not foreclose the possibility that the statutory command we construed here might reasonably be read under particular circumstances and upon a sufficient showing of necessity to allow some deviation between upwind and downwind deadlines. Necessity. What's the necessity here? I'm not sure what that means, but I can tell you. So you think it means parity, apparently. So it's a reading into the word necessity. It's an odd word for parity. I'm not reading the word parity into necessity. I'm reading the word parity into the F-314, the equitable concern. But I'd like to go to the next sentence, Your Honor. It says any such deviation would need to be rooted in Title I's framework. Title I includes all of the substantive requirements for marginal areas, all of the substantive requirements for moderate areas. So what EPA is saying, well, you don't have to do anything but collect data as a marginal area. So I think the moderate area is the correct date. I mention this, Your Honor, because it sounds like you're interested in making a finding based on a holding based on the 2021 versus 2023 issue based on what Wisconsin says. And if that's what the court is considering, I would ask for supplemental briefing on that question because, you know, we had very little space in the 28-J letters to talk about that. But I would also like to emphasize that I just don't think the court needs to get to that issue because they didn't make their case for any future nonattainment date. Delaware didn't prove nonattainment by 2021 or any other future date. So whether you think it's 2021 or 2023 or 2025, it's not dispositive for this case. Thank you very much. Is there time remaining? We'll let the other side go over by 11, so we'll divide that a little bit and give you five minutes. Thank you, Your Honor. I think these points should be relatively brief. First, on the discussion that Kessler was just having with the court, Congress knew how to make exceptions in the Clean Air Act where it wanted to make exceptions. There is no exception that good neighbor obligations do not apply to marginal nonattainment areas for OZM. That's simply nowhere in the Act. Tellingly, UTA nowhere in this entire case has ever acknowledged the consequences that apply to nonattainment areas. There are economic consequences that exist even for marginal areas. Any new major source of pollution is required to obtain emission offsets. That is an economic burden on a downwind state that is subjected to marginal nonattainment area, as such in marginal nonattainment. And there are public health consequences. The reason UTA established these standards in the first place, which they needed to establish exclusively based on health considerations, is because people who live in nonattainment areas breathe unsafe air. That is why the Act makes its central goal. And if you look at this language in Wisconsin, it's saying that the central purpose of the Act is to bring areas into attainment by attainment dates. So UTA completely ignores that. They are entirely focused on the control cost equity in a way that I think is also, if you look at the record, Delaware, if you look at its petition, shows that based on UTA's own modeling, Delaware is responsible for less than 10 percent of its own OZM problem. Pennsylvania by itself is responsible for 20 percent of Delaware's OZM problem. There's nothing equitable about requiring Delaware to try to squeeze more blood from a stone than there is about requiring optimization of already installed controls on sources in Pennsylvania. A couple points on the record. The Council for EPA just misstated the record with regards to the 2008 OZM standard as it applies to Delaware. The modeling that EPA relied on, the 2017 modeling that EPA relied on, to conclude that there was a modeled nonattainment problem for Maryland, that same modeling as Council for Delaware recognized, shows that there is also a modeled nonattainment problem in the Philadelphia nonattainment area. The fact that that monitor is located outside the boundaries of Delaware, as I believe the record was recognizing, is immaterial here. The consequences that flow from that nonattainment flow regardless of where that monitor is located. EPA's argument that the fact that some of these sources are located in Pennsylvania and this monitor happens to be in Pennsylvania is too cute. That Delaware's petitioning because it is in nonattainment, it's irrelevant where that location of that monitor is. And so I think EPA's argument, EPA tries to do too much with the location of these sources. Delaware is petitioning not based on Pennsylvania's nonattainment, but based on its own nonattainment which flows from this monitor. Finally, for the 2015 standard, EPA contends that there is no evidence in the record that Delaware will struggle to attain at a future date. That is also simply incorrect. The record, as EPA does not dispute, joint appendix page 13 and 15, shows the most current monitor data for Delaware. Those data show that three of the four monitors in New Castle County are failing to attain the 2015 standard as of that year. Those data also show that the 2017 monitor values, which are monitor values that will be used to determine if they're going to affect attainment in future years, are also showing exceedances of that air quality standard. So Delaware is in fact going to struggle to, because of its failing air quality at the time it filed the petition and through the time that EPA denied the petition, EPA is going to continue to struggle to attain the standard based on those data are going to carry forward for three years based on the way those nonattainments are calculated. Okay, thank you very much for the questions. How much time did he have? For the order. All right, we'll give you five minutes also. Thank you, Your Honor. I'd like to start by trying to address the question you had asked me earlier and that I obviously struggled to give a clear enough answer to you. At the end of the day, the EPA is relying on aggregate assumptions from the update rule to justify its single uniform level of optimization, which by its own recognition and by its own language in the update rule said was only appropriate due to the partial nature of that remedy. And this court has now remanded that decision, saying a partial remedy was not good enough. Is it a partial remedy that wasn't good enough or just that the date of attainment wasn't good enough? It said to provide a complete remedy. The Wisconsin decision. Yes, but is it, was that, was the problem because of the partial nature or because of the date that it didn't attain by the attainment date of the document? Well, it only, it wasn't just about attainment. It didn't provide for a complete remedy by the time that for their own compliance. So the date does factor into that, but the rule itself was a partial remedy set to implement partial, the partial remedy by the attainment deadline. And so downland states were then necessarily required to make additional emissions reductions without the benefit of the reductions it was required to have. And so this court has remanded to EPA to provide a complete remedy in it, you know, consistent with the attainment deadlines to the extent EPA can even do that now. And opposing counsel said that the CASPER update is already providing what Maryland has asked for. And it is not. Maryland is using the own general assumptions that EPA has stated that certain sources can do better than this generalized partial rate that EPA presented and saying these are the sources that can do better. And moreover, all the sources that were petitioned aren't even meeting the rate that EPA says is a generalized rate. There are 13 sources that exceeded the 0.10 rate. When EPA says that it took a look at the data and saw that most of the sources, that the sources are operating, it says the sources are operating based on an emissions average of 0.20. That's double than the rate it said is supposed to be an optimized rate, even though Maryland disagrees that that's the optimized rate for these particular petition sources. And finally... On that narrow point, why isn't it perfectly rational to say here's the optimal rate on average across all plants and here's the optimal rate for least efficient? I think that would be reasonable if EPA... One is 0.1 and one is 0.2. I think that would be reasonable if EPA had looked at the particular sources named in the petition, evaluated the specific data from these sources, and made that determination. But the aggregate assumptions it used relied on high emissions from sources outside the petition sources. It threw out data on the basis that the lowest rates might have been from newly installed equipment, when Maryland showed that its petition sources had installed their controls in the years 1999 to 2004, and that the best rates were sometimes a decade more than when their controls were installed. Just the underlying assumptions here don't line up with the facts presented in the petition. And in order to be granted deference, as this court knows, EPA needs to justify its decision based on the facts in the record. And it hasn't done that here. As far as burden, Your Honor, EPA has already conceded that Maryland's got an attainment problem, that the upland states were linked, and that it presented a technically sufficient petition. I'm not sure what else Maryland was supposed to present here. We discussed the cost-effectiveness of the remaining emissions reductions beyond what were implemented in the update rule in 2017 in the petition. Maryland used the same, you know, Sergeant Lundy calculations to assess cost-effectiveness for the sources controlled by catalytic controls and showed the remaining emissions reductions fell within a $500 to $1,400 per ton reduction, which EPA said is cost-effective for those controls already. And so it's unclear what further burden Maryland needed to present in a petition. With regard to non-catalytic controls, I think EPA's position is a mischaracterization of what it said in the update rule. The update rule did not find that any controls above $1,400 per ton are not cost-effective. What it focused on as part of its partial rule was the most cost-effective. It looked at what got the biggest bang for the buck and explicitly stated that that determination, the $1,400 per ton, was not determinative of future cost-effectiveness evaluations. This court has remanded the Rule 2 EPA for a complete remedy. We don't know, as I think Your Honor was alluding to, where that line is, where the new cost-effectiveness line will be to provide a complete remedy, and we're not asking this court to make that determination here. But to be told that a source that has already spent the money to install a control doesn't need to even run those controls because the emissions are too small doesn't line up with the way EPA treated small emissions in the category. I'm sorry. You said you're not asking us to make the policy-laden judgments about where to draw those lines, but you really are to the extent that if we accept your argument on burden is you don't have to prove the negatives about any possible alternative technology. You've come in and made a presentation with regard to non-catalytic, and we rule in your favor that will be a necessary part of the next update rule, even though there may be all sorts of other options on the table and even though those are actively under consideration, presumably, on the Wisconsin remand. This court certainly can go that far. I think the point I was trying to make is EPA has said in the past that these are cost-effective. Non-catalytic and non-catalytic controls are the most cost-effective controls for power plants, and it has upheld the use of non-catalytic controls as reasonably available control technology in consideration of economics in other parts of the Clean Air Act, and to now turn that on its head and say we don't think these are cost-effective, based on our language in the CAF for update, which only says we're focusing on the most cost-effective and this is not determinative of future cost-effective determinations, is just too far. What's your answer to opposing counsel's argument with respect to the catalytic controls that even if they impose some additional optimization requirement without a change in the CAF, it won't make any difference? If they optimize more, then they'll be able to sell their allowances or buy allowances, et cetera. Number one, these might be the sources that are running more frequently, so that's not necessarily true, Your Honor. What's not necessarily true? That a different source will be able to necessarily emit more within the state of Maryland or another state affecting Maryland? Well, it's not within the state of Maryland. These are uplink sources. Well, there are limits on how much a source can buy, how much a state can buy from another source. There are assurance levels. 125% or something like that. Right. So what? So do we know whether this will go above that amount? No, Maryland didn't. It only performed an over-control analysis to say if we look at what CASPER update required and if we get this additional reduction, whether that would result in over-control, and the answer was no, and EPA's analysis agrees with that. But other than that analysis, I can't point to you to anything in the record that says whether, you know, this remedy that Maryland's seeking at the end of the day will resolve the problem or not. I can't answer that, but Maryland believes it's an important step forward, and for EPA to say it's unnecessary because that will just be observed by somebody else. We're not sure. We don't know what a complete remedy is going to look like. We just know that these sources are sources that are able, from a historic perspective, to run a lot better than they are. EPA acknowledges certain sources can run a lot better than 0.1. EPA acknowledges that its uniform level that it applied in the CASPER update was only appropriate, given the partial nature of its rule, and Maryland's seeking to resolve its, you know, problem, the interference with its own maintenance from upwind sources where, you know, up to 70% on certain days come from upwind sources. That's a number Maryland has measured through high altitude monitors and airplanes measuring ozone and a number consistent that this court found in the Wisconsin opinion per EPA's own record. Let me just ask if there are further questions from the audience. Thank you very much. We'll take the mat on the other side.
judges: Garland, Henderson, Katsas